983 F.2d 1069
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Freddie N. JACKSON, Defendant-Appellant.
 No. 92-5215.
 United States Court of Appeals, Sixth Circuit.
 Jan. 15, 1993.
 
 Before KENNEDY and BATCHELDER, Circuit Judges, and ENGEL, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Defendant Freddie N. Jackson appeals his jury conviction for attempt to possess with intent to distribute crack cocaine. Jackson was indicted by the Federal Grand Jury for the Western District of Tennessee on August 7, 1991. After a three-day jury trial, the defendant was found guilty of attempted possession of approximately 2.3 grams of cocaine base with intent to distribute, in violation of 21 U.S.C. § 846. Jackson was sentenced to 41 months imprisonment, followed by a three-year term of supervised release. A timely notice of appeal was filed.
 
 I.
 
 2
 The defendant, a deputy official at the Shelby County Jail, was the target of an internal investigation designed to identify those jailers involved in delivering drugs to the inmates in exchange for money. The Sheriff's Department, which was conducting the investigation, recruited informants among inmates as well as persons outside of the jail.
 
 
 3
 In this case, Theodore Roosevelt Carr, an inmate at the jail, and his wife Estella D. Carr, worked with the Sheriff's Department. Lieutenant Beverly Jean Archer, who was in charge of the investigation, gave Mrs. Carr imitation crack cocaine, made by the toxicology lab at the University of Tennessee, to give to the defendant, who in turn was to deliver it to Theodore Carr. Mr. Carr had been given noticeable amounts of money to flash around the jail. Upon receiving the "cocaine" from Jackson, Carr would pay him and would then pass it on to Sergeant Dowdy, a deputy jailer, who would return it to Lieutenant Archer.
 
 
 4
 The sting went according to plan. The defendant agreed to bring something in for Mr. Carr in exchange for $100. Mrs. Carr called the defendant and set up a meeting time and place at which she would give the defendant the "cocaine" to give to Mr. Carr. Mrs. Carr recorded two of her telephone conversations with the defendant. On October 6, 1990, they met at a convenience store parking lot at about 6:00 a.m. Mrs. Carr was wired by the Sheriff's Department when she met the defendant. She testified that she gave him nine rocks of "cocaine" as well as $50. A Lieutenant Jerry Burross and Lieutenant Archer observed the transaction from a surveillance vehicle.
 
 
 5
 The defendant alleges several errors on appeal. First, he argues that the District Court erred in failing to conduct a Batson hearing after the defendant challenged the government's peremptory challenges against black jurors. Second, the defendant contends that the Court erred in admitting several pieces of evidence. Finally, the defendant argues that his conviction was not supported by sufficient evidence. We AFFIRM.
 
 II.
 A. Batson Hearing
 
 6
 In Batson v. Kentucky, 476 U.S. 79, 84 (1986), the Supreme Court held that the Equal Protection Clause forbids the prosecutor from challenging potential jurors solely on the basis of their race. The defendant challenger bears the burden of establishing a prima facie case of discrimination. Once the defendant has made this showing, the burden shifts to the prosecutor to provide a race-neutral explanation for the peremptory challenges. Id. at 97; United States v. McCoy, 848 F.2d 743, 745 (6th Cir.1988). A District Court's determination, which turns largely on credibility evaluations, that a defendant has or has not made out a prima facie case of intentional discrimination is owed great deference by a reviewing court. Batson, 476 U.S. at 99 n. 21.
 
 
 7
 In McCoy, this Court set forth the prima facie elements a defendant must satisfy when making a Batson challenge: 1) that the defendant is a member of a cognizable racial group; 2) that the prosecutor has exercised peremptory challenges against members of the defendant's race; and 3) that the relevant circumstances raise an inference of purposeful discrimination. McCoy, 848 F.2d at 745.
 
 
 8
 What constitute relevant circumstances sufficient to raise the inference of discrimination has been addressed by both the Supreme Court and this Court. In Batson, the Supreme Court states that illustrative considerations include whether there was a pattern of strikes against jurors of a particular race, as well as the prosecutor's questions and comments during voir dire. In United States v. Sangineto-Miranda, 859 F.2d 1501, 1521 (6th Cir.1988), this Court rejected a per se rule that a showing by the defendant that the government used all its peremptory challenges against blacks, without more, makes out a prima facie case of intentional discrimination. We also directed trial courts to consider additional factors, including
 
 
 9
 1) the racial composition of the initial group seated and the final jury panel sworn; 2) the number of peremptory strikes allowed each side; and 3) the race of those who were struck or excused from the jury panel throughout the voir dire (whether for cause or by a peremptory challenge), the order of strikes, and by whom they were exercised. In an appropriate case, it may also be useful to consider evidence as to the percentage of the "cognizable racial group" in the jury pool, or the racial composition of the district wherein the jury pool is selected.
 
 
 10
 Id. at 1520.
 
 
 11
 This Court also provided circumstances which tend to either refute or support an inference of discrimination necessary to make a prima facie case. If the final jury has a percentage of minority members that is equal to or greater than the percentage of minority members in the original impaneled jury, that would be a factor tending to refute the inference of discrimination. If the prosecutor exercises the upper limit of the allowed peremptories, this would support the inference. Id. at 1521-22. Moreover, "if the defense has clearly engaged in a pattern of striking non-minority members, that might make an inference of discrimination arising from the prosecution's opposing strikes less tenable." Id. at 1522. However, this will be influenced by the specific mechanics of carrying out strikes. Id. at 1522 n. 15.
 
 
 12
 The present case raises the same issue as that in Sangineto-Miranda, i.e., whether the district court erred in determining there was no prima facie case established. The fact that the prosecutor used all six of his allowed challenges to exclude six black jurors from the final jury supports an inference of the prosecutor's discriminatory purpose in his exclusions. There is no obviously apparent race neutral reason in the record as to why the prosecutor would want to exclude potential jurors Adams, Patton and Lacy.
 
 
 13
 However, there were more factors tending to refute the inference of discrimination than those supporting it. The defendant conceded that juror McFadgon (mistakenly referred to as "McVay") was questionable and challenged only five of the government's six strikes under Batson. Of those five, the court found that two were properly excused. It noted that "Barbara Reed was a former worker at the Shelby County Jail. James White seemed extremely uninterested in anything[, plus his son was convicted by the prosecutor in this case]." The transcript shows that there were reasons for excluding several other potential jurors.[1] However, the court reporter failed to identify these particular jurors who gave that information. It is possible that these statements were made by Adams, Patton or Lacy. Equally as important as these reasons for challenging the excluded black jurors, is the fact that the ultimate jury contained a larger percentage of black jurors than the original pool.[2]
 
 
 14
 Finally, the defense used nine of its ten challenges to exclude whites. This factor bears on the inference of discrimination only in cases where the defense is allowed to make all of its peremptories before the prosecution. For example, where the defense exercises all of its peremptories to exclude six whites from a venire of six whites and six blacks, there is less reason to infer discriminatory intent when the prosecutor's subsequent strikes fall solely on the remaining blacks. Sangineto-Miranda, 859 F.2d at 1522. In the present case however, the parties exercised their strikes simultaneously.
 
 
 15
 The defendant argues that the District Court erred in that it considered only the exercise of challenges by the defense in making its ruling and not other relevant considerations. The defendant bases his argument on the following portion of the voir dire proceeding:
 
 
 16
 MR. DISCENZA [Asst. U.S. Attorney]: I do need one other thing in the record, and I believe counsel will stipulate that all of their challenges were to white jurors.
 
 
 17
 MR. GREEN [Defense Counsel]: In other words, I'm right, but I've challenged the route you took; is that right?
 
 
 18
 THE COURT: That's right.
 
 
 19
 MR. GREEN: Because I wouldn't have done it if I had known the defense was going to--
 
 
 20
 THE COURT: Nine out of ten.
 
 
 21
 MR. DISCENZA: Nine out of ten.
 
 
 22
 THE COURT: For that reason, I will deny the motion.
 
 
 23
 Joint App. at 132. Taken out of context, this isolated section of transcript supports the defendant's argument. However, the district judge made the following remarks immediately before the above exchange:
 
 
 24
 Okay. I do not believe a prima facie case has been made, although six of these challenges were to--six out of six were to black jurors, in almost every case, I personally saw a reason to challenge a number of them. But more importantly is the fact that we have a jury that involves six out of twelve jurors who are black, and I just--given that there were thirteen on [the venire], I just don't find any basis to conclude that a prima facie showing has been made, that the government has raised these challenges because of the race of these jurors.
 
 
 25
 Id. These remarks make it clear that the district judge considered all of the relevant circumstances, including but not limited to the exercise of challenges by the defense in ruling on this issue. In light of the high degree of deference owed the District Court on these matters, we find that the District Court did not err in concluding that the defendant had failed to raise an inference of purposeful discrimination against potential black jurors on the basis of race.
 
 B. Admission of Evidence
 
 26
 The defendant challenges the admission of certain exhibits into evidence as reversible error. The decision to admit or exclude evidence is within the sound discretion of the trial court and should be reversed on appeal only for a clear abuse of that discretion. United States v. Phillips, 888 F.2d 38, 40 (6th Cir.1989). Abuse of discretion exists where the reviewing court is firmly convinced that a mistake has been made. Id.
 
 1. Imitation Crack Cocaine
 
 27
 The defendant contends that the District Court abused its discretion in admitting the imitation crack cocaine that the defendant allegedly received from Estella Carr and delivered to Theodore Carr, because the chain of custody was not properly established. In United States v. Levy, 904 F.2d 1026, 1030 (6th Cir.1990), cert. denied, 111 S.Ct. 974 (1991), this Court held that, "[a]bsent a clear showing of abuse of discretion, challenges to the chain of custody go to the weight of evidence, not its admissibility."
 
 
 28
 The government presented evidence of where the crack was at all times from the time Lieutenant Archer gave it to Mrs. Carr, until it was ultimately returned to the Lieutenant, who kept it in storage until trial. The Court did not abuse its discretion in admitting the imitation crack cocaine. Any doubts concerning the chain of custody of the exhibit went to its weight and not to its admissibility.
 
 2. The Telephone Tape (Exhibit 3)
 
 29
 The admission of tape recordings at trial is within the sound discretion of the District Court. United States v. Robinson, 707 F.2d 872, 876 (6th Cir.1983). To be admissible tapes must be authentic, accurate, trustworthy, audible and comprehensible. Id. Abuse of discretion is present only where "the unintelligible portions are so substantial as to render the recording as a whole untrustworthy." Id. (citing United States v. Jones, 540 F.2d 465, 470 (10th Cir.1976), cert. denied, 429 U.S. 1101 (1977)).
 
 
 30
 Mrs. Carr tape recorded two telephone conversations with the defendant. She accidentally overlapped the recording of the two conversations, so part of the first conversation was lost. There is nothing in the record indicating that the tape was so inaudible as to be unintelligible, and the defense never objected on the basis of inaudibility. The court requested that the tape be stopped, adjustments to the equipment were made and the court allowed the tape to be played to its conclusion. The court instructed the jury to rely on what it heard and not on what the transcripts said. The court made sure that the tape was authentic, audible and trustworthy and therefore did not abuse its discretion in admitting the exhibit.
 
 3. The Body Wire (Exhibit 4)
 
 31
 The body transmitter Mrs. Carr wore was connected to a recorder, monitored by Lieutenant Archer, located in a surveillance van. The government played the first portion of this tape and later moved for its admission into evidence without objection from the defendant. Because the defendant did not object below, the court's decision to admit the recording is reviewable under the plain error standard. United States v. Causey, 834 F.2d 1277, 1281 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988).
 
 
 32
 After playing the first portion of this tape, the government asked Mrs. Carr to identify the voices on the tape and then moved that the tape be marked for identification only. Not only did the defendant fail to object to the playing of the tape, he also asked that the entire tape be played so that the jury could get the full context of the conversation between Mrs. Carr and the defendant. The prosecutor was willing to play the remainder of the tape for the jury but he believed that much of it was inadmissible. After a discussion outside the presence of the jury, the court decided to mark the tape and the transcripts of the recording for identification only. The court then stated:
 
 
 33
 For the record, we played the tape down to the point where Jackson is attributed to say [sic] I will have him beep you and CI attributed to--attributed to saying do that. On the transcript there are additional portions that we [sic] not played and anything else on the tape after that point also has not been played up to this point in the trial. I'm going to receive into the record as Exhibit 4 for identification only. If there are portions on the tape that you consider appropriate to play in your case in chief, of course, you may do so, subject to whatever objections that may be raised.
 
 
 34
 Joint App. at 195-96. No other portion of the tape was played for the jury.
 
 
 35
 The defendant argues that he was prejudiced because the court allowed the tape to be played without admitting it into evidence. However, an examination of the record shows that the government moved to have it admitted during its examination of Lieutenant Archer. Joint App. at 223. The defense stated that it had no objection to its admission. Id. The court was able to make a first hand determination as to the audibility and trustworthiness of the tape, and thus, did not abuse its discretion in admitting the tape. Moreover, the court's admissibility determination doesn't approach plain error.
 
 C. Sufficiency of the Evidence
 
 36
 Finally, the defendant raises a sufficiency of the evidence challenge to his conviction. The standard of review for these challenges is that the appellate court must uphold the jury's verdict if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This Court must draw all reasonable inferences in the government's favor. United States v. Allen, 954 F.2d 1160, 1169 (6th Cir.1992).
 
 
 37
 A review of the trial testimony quickly indicates that there was sufficient evidence presented from which the jury could conclude that the defendant attempted to possess crack cocaine with the intent to distribute. The defendant's contention to the contrary is without merit.
 
 III.
 
 38
 Accordingly, the District Court's decision is AFFIRMED.
 
 
 
 [1]
 For example, one prospective juror worked for the Sheriff's Department. A female prospective juror was engaged to a man who was a correction officer at the penal farm. Another had a good friend who worked in the public defender's office. During its voir dire, the Court asked whether any juror or members of their family had been involved as a defendant in a drug-related crime. An unidentified female prospective juror answered in the affirmative about her sisters
 
 
 [2]
 The original pool of 28 potential jurors included 13 blacks. The jury selected included six black jurors and six white jurors